93 N.J. Super. 235 (1966)
225 A.2d 596
WINDSOR CONTRACTING CORP., A NEW JERSEY CORPORATION AND SHADY REST TRUCKING CO., INC., A NEW JERSEY CORPORATION, PLAINTIFF-RESPONDENT,
v.
VINCENT BUDNY AND BUDNY'S TIRE SERVICE, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued October 24, 1966.
Decided December 9, 1966.
*237 Before Judges GOLDMANN, KILKENNY and COLLESTER.
*238 Mr. Edward B. Meredith argued the cause for appellants (Meredith & Meredith, attorneys).
Mr. Anton J. Hollendonner argued the cause for respondent Windsor Contracting Corp.
The opinion of the court was delivered by KILKENNY, J.A.D.
Defendants appeal from a judgment awarding $5003.91 as damages against them and in favor of plaintiff Windsor Contracting Corp. and denying their claims against Windsor.
Plaintiffs sued in replevin for possession of 67 truck tires, inner tubes and tire rims, as well as other specified wheel locks, nuts, wheel studs and 13 unmounted used truck tires, allegedly wrongfully taken by defendants on or about August 29, 1964. They also sought damages for the value of the tires and other items, and also damages for the detention. Defendants admitted the taking and claimed legal justification for so doing under the Garage Keepers' Lien Act, N.J.S. 2A:44-21. They alleged that plaintiffs owed them $2,423.24 for tires and automobile accessories sold and serviced. Defendants sought judgment for possession of the chattels involved, for the debt due and for damages occasioned by the repossession and storage.
We understand that plaintiffs filed a replevin bond and were awarded possession of the articles in question a few weeks after the taking by defendants and pending the trial.
In the pretrial order of June 9, 1965, it was provided that the parties would stipulate: "Sale of said tires, goods and chattels by defendants; that there is a balance due defendants by plaintiffs of $2,423.24 as of July 2, 1964; and that certain tires, goods and chattels were repossessed by their employees on or about August 29, 1964." The pretrial order framed the issues in the form of the following two questions:
(1) Does a garageman have the right to take possession of an entire vehicle part of which consists of goods and chattels sold by the garageman or only the items sold?
*239 (2) Does the garageman's lien extend to equipment not sold by the garageman?
As hereinafter indicated, the pretrial order was poorly expressed and the questions posed were vague, inadequate and not specific enough, in the light of the facts of this case, as became manifest at the trial.
The case was tried without a jury on August 3, 1965. The following facts were developed. Plaintiff Shady Rest Trucking Co., Inc., had purchased some truck tires from defendants, had other tires recapped by them and purchased batteries and miscellaneous items for its trucks. Shady Rest owed defendants $2,423.24 for these items. Defendants made no sales to and rendered no services directly for plaintiff Windsor, a separate trucking company. In fact, they would not extend credit to Windsor because of prior dealings.
Shady Rest and Windsor occupied the same premises and there was a working arrangement between them. Windsor and Shady Rest had the same president, Joseph T. Hayes, and Windsor leased some trucks owned by Shady Rest. Although Windsor was unable to get any credit from defendants and Shady Rest enjoyed a limited credit, some tires sold to or recapped for and billed to Shady Rest were placed on trucks owned by Windsor. There was testimony that Shady Rest purchased the tires and then sold them to Windsor for use on Windsor's trucks.
However, an inference could be drawn from the record that Windsor was using the credit of Shady Rest to acquire for the Windsor truck tires which Windsor itself could not purchase on credit from defendants. In fact, Windsor's officer, Lawrence E. Pecan, testified that defendants knew that, although the tires and accessories were being charged to Shady Rest, they were being used by Windsor. Defendants denied such knowledge.
Budny testified that, upon learning of the recent formation of Windsor, he went to the joint place of business to get the money due his firm and there spoke to Hayes, who *240 was then president of both corporations. Hayes told him, "Larry Pecan took over that responsibility now, it is his job to pay your bill." Hayes led Budny to believe that there was a "sort of partnership" between the two corporations and that "Mr. Pecan was going to be total boss of the operation." As a result, Budny demanded payment from Pecan on several occasions, but received no payment. Budny testified that Hayes and Pecan came to his office and requested a further credit extension, which he refused. In all events, Budny stated that he was made to feel that Windsor could be looked to for payment, despite the fact that the book account showed Shady Rest as the debtor.
Unwilling to wait any longer for payment, defendant Budny decided to take the law into his own hands. About 6 P.M. on August 29, 1964, a Saturday night, defendant Budny went to the premises jointly occupied by plaintiffs to look for tires recently sold to Shady Rest. He found some on that company's trucks and he found on Windsor trucks one or two, and in some instances three, tires that had been sold to Shady Rest. He then instructed his son to get a fleet of trucks, and men, and go down that same night to the Shady Rest-Windsor yard and there strip from the trucks of both companies every tire from any truck on which a Budny sold tire could be found, and to take enough tires from which to realize the $2,423.24 owed to him. The son and crew did this and returned somewhere between 9 and 10 P.M. They brought back some 65 tires. Some of these had been sold by defendants to Shady Rest and not paid for. But they also took from Windsor's trucks some 43 tires, tubes and rims, which had not been sold or serviced by defendants but which Windsor had purchased from other sources.
This replevin suit followed when defendants refused to turn over to plaintiffs the seized tires and other items upon demand made. The trial court ruled as a matter of law that defendants' seizure of Windsor's 43 tires, tubes and rims, was improper and not within the purview of the Garage Keepers' Lien Act. N.J.S. 2A:44-21. The matter was set *241 down for a hearing as to damages only. As a result of that hearing, plaintiff Windsor was awarded damages against defendants in the sum of $5,003.91. Defendants were awarded damages against Shady Rest alone in the sum of $2,423.24. A motion by defendants to reopen the judgment for further proofs, upon the basis of affidavits by defendant Budny and Hayes, president of Shady Rest, was denied. This appeal by defendants followed.

I
We agree with the trial court that defendants had no legal right to remove from Windsor's trucks the 43 tires, tubes, rims and accessory equipment, which Windsor had purchased from others, merely because one or two or three other tires, sold by defendants to Shady Rest and not paid for, were found on Windsor's trucks by virtue of some business arrangement between Shady Rest and Windsor.
There is no merit in defendants' argument that they had a common law artificer's lien on Windsor's trucks and were exercising their rights thereunder. The factual situation herein would not give rise to such a common law lien against Windsor's trucks. 7A Blashfield, Cyclopedia of Automobile Law and Practice, § 5099 (1950); Brown, Personal Property, § 108, at p. 470 (1936). Neither would the common law artificer's lien continue once the artisan surrendered possession of the chattel whose value he had enhanced by his services. The common law lien was merely a right to retain possession. It would not apply or persist after surrender of possession in a case such as this.
Defendants claim justification under the statutory Garage Keepers' Lien Act, N.J.S. 2A:44-21, which provides:
"A garage keeper who shall * * * repair a motor vehicle or furnish gasoline, accessories or other supplies therefor, * * * shall have a lien upon the motor vehicle or any part thereof for the sum due * * * and may, without process of law, detain the same at any time it is lawfully in his possession until the sum is paid." (Emphasis added) *242 See Crucible Steel Co. of America v. Polack Tyre & Rubber Co., 92 N.J.L. 221 (E. & A. 1918), upholding the constitutionality of the act, and the right of an unpaid seller of four rear wheel truck tires to seize the vendee's truck, to which the tires had been applied.
The facts herein are obviously different from those in the Crucible case. Defendants did not seize any truck to which their tires had been applied. Nor were they content to seize from Windsor's trucks the tires sold or serviced and charged to the account of Shady Rest, for which payment had not been made. Rather, as noted above, defendants took from Windsor's trucks, besides the tires sold to or capped for Shady Rest, some 43 tires, tubes, rims and accessory parts which they had never sold or serviced for either Shady Rest or Windsor, but which Windsor had purchased from other sources. They argue that they had a right to do so, because of the language in N.J.S. 2A:44-21 which gives the garage keeper a lien "upon the motor vehicle or any part thereof." (Italics ours)
We find no authority in the law to support this strained and unreasonable interpretation of N.J.S. 2A:44-21. Were we to adopt that rationale, the unpaid vendor of a battery, rear view mirror or gasoline could remove the engine of the car, even though he never sold or serviced the engine. We are satisfied that such was not the legislative intent. When reference is made in N.J.S. 2A:44-21 to the right of lien "upon the motor vehicle or any part thereof," it reasonably means the right to retain possession of or to retake peaceably possession of either the entire motor vehicle or that part thereof sold, repaired or serviced by the garage keeper.
This legislative intent is further manifested by N.J.S. 2A:44-22, which provides in pertinent part:
"A garage keeper acquiring a lien under this article shall not lose the same by reason of allowing the motor vehicle or part thereof to be removed from his control, and if so removed, he may * * * seize without force and in a peaceable manner the motor vehicle or part thereof, wherever found in this state." (Emphasis added.) *243 This indicates that the right of lien may have existed in the first instance only as to a part of the motor vehicle, such as in the case of an engine removed from the vehicle for repair at the garage. If he allowed that part to be removed after his repairs, he might thereafter regain possession thereof under N.J.S. 2A:44-22.
The stripping herein of all tires, tubes, rims and accessories from Windsor's trucks merely because there was found thereon one or more tires sold to Shady Rest, was in excess of any right conferred by N.J.S. 2A:44-21. Windsor's trucks were left in its yard, stripped of its tires and propped up on blocks. Demand for return of its tires was refused. Windsor obviously suffered damages as a result of this excessive wrongful seizure, having been temporarily put out of its trucking business until it could re-equip its trucks. Also, some of Windsor's trucks were allegedly damaged by defendants' agents.

II
The record before us precludes an evaluation of the correctness of the award of damages and we find it necessary to remand the matter to the County Court for a new trial on the issue of damages.
In the first place, the parties stipulated in the pretrial order, as noted above, "that there is a balance due defendants by plaintiffs of $2,423.24 as of July 2, 1964." (Emphasis added) The trial court recognized this stipulation when, in a preliminary memorandum of law disposing of the legal issues, it said prior to its ultimate findings of fact and conclusions:
"It was stipulated at trial that plaintiffs owed defendants $2423.24 which included items other than tires, tubes, rims, etc." (Emphasis added).
Despite this express stipulation in the pretrial order, and as to which there was no amendment, conflicting testimony was presented at the trial as to whether Windsor was or *244 was not jointly or separately obligated to pay the debt of $2,423.24, carried on defendants' books solely in the name of Shady Rest.
This obvious inconsistency between the stipulation and the testimony evidently induced the trial court to ignore the stipulation and ultimately find that only Shady Rest owed the debt to defendants. Hence, the judgment therefor in defendants' favor was against Shady Rest, and not against Windsor.
However, we have more obvious difficulties in finding justification for the damages of $5,003.91 awarded to Windsor. The bulk of that damage claim represents the purchase price of new tires for Windsor's trucks to replace the used tires which defendants had wrongfully removed. No credit was given defendants for the tires, tubes, rims and accessories, whose return was obtained by Windsor within a relatively short time after their taking and as soon as plaintiffs filed their complaint and replevin bond. Thus, Windsor obtained a return of its old tires, etc., and at the same time has a judgment for an amount which includes in large measure the purchase price of many new and some used replacements. For this reason, the compensatory damages appear to be excessive. There was no finding of malice and no award was made for punitive damages, which could justify the apparent excessiveness.
Finally, the damage award of $5,003.91 seemingly was not based upon competent proof thereof. This was probably due to some confusion at the trial, born of a lack of clear articulation by trial counsel. When Windsor's attorney was questioning Lawrence E. Pecan, then its president, and had reached the point of proving Windsor's damages, the witness had before him a memorandum, evidently to be used to refresh his recollection, if the need arose. The trial court intervened at this point and suggested that the memorandum be received in evidence, subject to the right of defense counsel to move to strike it out. Obviously, plaintiff's attorney did not object to the suggested procedure and the memorandum was marked in evidence as an exhibit. As such, it was accepted by the trial *245 court as sufficient proof of Windsor's damages. Defendants' attorney moved promptly to strike it out, but based his argument rather on the failure of plaintiffs to list Pecan's name in the answers to interrogatories as one of the officers or directors of either plaintiff corporation. The trial court denied the motion to strike.
Defendants' attorney ought to have based his argument to strike upon the more solid reason that this self-serving memorandum was not being used for its intended purpose, to refresh recollection, but as an improper proof of damages. Moreover, a supplementary affidavit, submitted to the trial court before judgment was entered, evidenced that some answers to the interrogatories were false, especially in respect to the names of the officers and directors of plaintiff corporations, albeit the affiant, Hayes, was the same person who verified the answers to the interrogatories, as the then president of plaintiff corporations.
We are satisfied that a plenary trial on all issues relating to damages is necessary in the interest of justice. The debt due defendants may be explored for a determination as to whether Windsor, by its agreement of merger or otherwise with Shady Rest, subsumed that obligation so as to make it liable to defendants, as a third party beneficiary of that agreement, or upon any other legal theory. See Lawrence v. Fox, 20 N.Y. 268 (Ct. App. 1859).
Also, the propriety of Windsor's being awarded damages for the price of new tires and the other items purchased by it, when the repossession of their used tires and accessories was obtainable promptly by a replevin action, a remedy actually pursued a few weeks after defendants' taking, also requires a reexamination. Especially is this so, since Windsor has its former tires and other items, as well as a judgment for the replacements. The proof of damages, unless stipulated, should be in proper fashion and not by the method pursued at the former trial.
The judgment in favor of Windsor against defendants, both on the main suit and on the counterclaim, is reversed *246 and the matter is remanded for a new trial, consistent with this opinion.
GOLDMANN, S.J.A.D. (dissenting).
I must dissent from my colleagues' construction of N.J.S. 2A:44-21. Before proceeding to a discussion of that statute, I would supplement the majority's factual statement by the addition of a few details.
As the majority states, it is entirely clear from the record that Budny's refused to extend any credit whatever to Windsor; it would deal with Shady Rest only. Although the record does not make entirely clear the exact relationship between Shady Rest and Windsor  whether it was a partnership, or whether Windsor was leasing from Shady Rest  the fact remains that Pecan was responsible for paying Budny's bill: he was "going to be total boss of the operation." And when Vincent Budny personally demanded payment from Pecan, it was promised for "maybe next week," "maybe the following week you will get a check." Further, Budny testified that when Pecan and Hayes came to Budny's Tire Service in July 1964, Pecan did all the talking and said that Budny's was to look to him for the payment. Although he requested that credit be extended to Windsor, none was given.
A word or two more about what happened on the evening of Saturday, August 29, 1964. Vincent Budny went to plaintiffs' terminal and surveyed the trucks, looking for tires recently sold to Shady Rest. He found some of them on the Shady Rest trucks, and the rest on the Windsor trucks. Each of the Windsor trucks had one, two or perhaps three tires that Budny's had sold or retreaded. Upon his return from plaintiffs' premises, Budny instructed his son to get some trucks and men and proceed to plaintiffs' yard and remove all the tires from any truck on which a Budny tire could be found, taking enough tires to realize the $2,423.24 owed. When the son returned with the tires later that evening, Vincent Budny phoned the local police department to inform *247 them that Budny's had repossessed the tires and if anyone inquired, to tell them he had them.
The next day, Sunday, Budny phoned plaintiffs' lot and received no answer. Pecan testified that he was at the lot that day, discovered the tires were missing, and found a written note from Budny's asserting that the seizure was under its garageman's lien. The following day, Monday, Vincent Budny spoke to Pecan and agreed to return the tires upon payment of the amount owed in cash, and he would immediately send his service man and replace the tires on the trucks. Budny testified that Pecan refused to talk to him What happened then was that Pecan, the very same day, went into the market and bought entirely new tires, the cost of which constitutes most of the $5,003.91 damages awarded Windsor. There followed the writ of replevin and the complaint here in question, alleging joint ownership of the seized items.
At common law Budny's would have had an artificer's lien on the tires, as long as they remained in its possession. The Legislature has greatly enlarged the common law lien. For example, the common law did not give a lien for furnishing items like tires, 7A Blashfield, Cyclopedia of Automobile Law and Practice, § 5099 (1950); Brown, Personal Property, § 108, at page 470 (1936), but our statute does. Crucible Steel Co. of America v. Polack Tyre & Rubber Co., 92 N.J.L. 221 (E. &A. 1918). Nor would the common law preserve the lien once the garageman voluntarily surrendered possession of the vehicle. However, N.J.S. 2A:44-22 changed this:
"A garage keeper acquiring a lien under this article shall not lose the same by reason of allowing the motor vehicle or part thereof to be removed from his control, and if so removed, he may, after demand of payment of claim * * *, and without further process of law, seize without force and in a peaceable manner the motor vehicle or part thereof, wherever found in this state."
The garage keeper's lien had its origin in L. 1915, c. 312, since amended by L. 1922, c. 231, L. 1924, c. 201, L. 1925, c. *248 33, L. 1926, c. 250, L. 1928, c. 67 and L. 1961, c. 121. There is no legislative history to enlighten the court in construing the statute; there are no legislative statements of purpose attached to the original bills that are of any help. We are therefore relegated to an examination of the express language of the statute.
N.J.S. 2A:44-21, as it read at the time here in question, provided in pertinent part that
"A garage keeper who shall store, maintain, keep or repair a motor vehicle or furnish gasoline, accessories or other supplies therefor, at the request or with the consent of the owner or his representative, shall have a lien upon the motor vehicle or any part thereof for the sum due for such storing, maintaining, keeping or repairing of such motor vehicle or for furnishing gasoline, accessories or other supplies therefor, and may, without process of law detain the same at any time it is lawfully in his possession until the sum is paid." (Italics ours)
And as stated, the garage keeper does not lose his lien by allowing the motor vehicle or any part thereof to be removed from his control.
Defendants acted under the Garage Keepers' Lien Act, N.J.S. 2A:44-21 to 31, and complied with all of its conditions. The issue presented is whether they had the right to seize not only the tires sold and serviced, but also other tires not supplied by Budny's and found on the same trucks as the tires it had supplied or serviced. I submit that the plain meaning of N.J.S. 2A:44-21 and 22 is that Budny's could do so, and that the judgment below was erroneous. If the statute gave Budny's the right to seize the whole vehicle, surely it gave the right to seize less. There is nothing in the Garage Keepers' Lien Act, reading all sections in pari materia, to indicate an opposite conclusion.
The three decisions cited by the trial judge in support of his determination are in no way pertinent. Wallace v. Terpis Garage, 17 N.J. Misc. 183, 7 A.2d 795 (D. Ct. 1939), holds merely that the act gives the garage keeper no right to recover constables' fees and expenses incident to seizure. Camden *249 County Welfare Board v. Federal Deposit Ins. Corp., 1 N.J. Super. 532 (Ch. Div. 1948), has no application whatever: it deals with the priority of liens affecting realty. Finally, Levy v. Public Service Ry. Co., 91 N.J.L. 183 (E. & A. 1918), held it was error to grant a $100 fee in an attorney's lien action where the client's recovery in a personal injury action was a $30 settlement figure.
If the statute means anything, it means that when a garage keeper sells a perishable product like a tire, the value of which deteriorates with every turn of the wheel, his statutory lien can be invoked to the extent necessary fully to protect his investment. The Legislature must have recognized this, as it recognized that a practical accommodation to today's "world on wheels" would be to allow a garage keeper to release a vehicle to the owner without fear of losing the lien which had attached immediately upon storage, repair or the furnishing of gasoline, accessories or other supplies. As was said in the Crucible Steel case, above:
"The innovation which the statute makes in the common law is neither startling nor novel in so far as it enlarges and extends the right of lien to conditions not included at common law, but is in line with the natural progress of the law to meet necessities arising from new business conditions; and the wisdom of this species of legislation is not a court question, but is peculiarly within the province of the law-making power to determine." (92 N.J.L., at page 227)
The majority opinion would limit the Budny lien either to the whole vehicle or vehicles, or strictly to the tires Budny's had supplied or serviced. The plain and clear meaning of the language in N.J.S. 2A:44-1 is that a garage keeper who provides gasoline, accessories or other supplies at the owner's request or with his consent, shall have a lien "upon the motor vehicle or any part thereof" for the sum due. To accept the majority's reasoning would be to read into the statute words which were not included by the Legislature, namely, that the lien attaches to "the motor vehicle, or any part thereof provided *250 or serviced" by the garage keeper. If that is what the Legislature meant, it could have so said in language equally as express and direct as the language it actually employed.
One need only hypothesize a situation where the view expressed by the majority would effectively defeat the statutory lien. Suppose the tires sold by Budny's to Shady Rest and which were placed on the Windsor truck wheels had been used to the point where, for all practical purposes, they were worn down to the thread. If Budny's were limited to taking only these worthless tires and could not take the remaining usable tires on the Windsor trucks, it could realize nothing on its lien. But Budny's could take the Windsor trucks themselves; the statute so provides. The whole is greater than any of its parts, and if the garage keeper chooses not to take the whole (the truck or trucks) as unreasonable in the circumstances, he should, under the statute, be able to take any part of the truck, if the legislative language has any meaning at all. Budny's could therefore take the usable tires or any other part of the Windsor trucks supplied with the tires it had sold or serviced for Shady Rest in order to realize upon its lien.
Or suppose a situation where A has two or three trucks which a garage keeper regularly supplies with gasoline. B acquires or leases the trucks from A, or goes into partnership with A, at a time when A owes a balance of $400 for the gasoline so supplied. The gasoline has long since been used up; the garage keeper is unable to obtain payment of the balance due. If he took one or more trucks, as he clearly could under the statute, he would be taking equipment worth many thousands of dollars. Instead, he elects to take the tires on the trucks, or an engine out of one of the trucks. Can it be said that he may not do so?
It was suggested in the course of oral argument that the statute is to be given a strict construction. The Garage Keepers' Lien Act is not in limitation of the common law artificer's lien; on its face it greatly enlarges upon that lien and affords the garage keeper a broadly stated right. In its remedial aspect, the statute must be liberally construed in *251 furtherance of the beneficial purpose intended. See 7A Blashfield, Cyclopedia of Automobile Law and Practice, above, § 5141.
What Budny's did was entirely reasonable. After repeatedly asking Pecan for the money due him and being promised payment "maybe next week," with no payment forthcoming, Budny's was justified in concluding that more drastic action was required if the money due was to be realized. The tires were seized after working hours on a Saturday night, and a note left on the windshield explaining why they had been taken and who had taken them. Pecan knew of the taking on Sunday. He made no effort to settle the matter that day or the next, when Vincent Budny phoned and told him he was ready to return the tires upon payment of the bill. Instead of doing this so that he could continue trucking without delay, Pecan, out of pique, anger or even malice, proceeded to buy entirely new sets of tires.
Pecan's remedy was very simple. All he had to do was to pay what was due and get the tires back. I find no good faith in what he did; the record fairly implies that he was not ready to pay defendant then, or possibly ever. Considering in an equitable light what Budny's did and the manner in which it acted, the equities are entirely with it.
Although the tires which Budny's had sold or serviced for Shady Rest had been transferred to the Windsor trucks, the Crucible Steel case, above, holds (as does the statute) that the lien followed the tires, and Budny's could have taken the trucks or any parts thereof to satisfy its lien.
As for the counterclaim, judgment should have gone in favor of defendants against both plaintiffs, and this if only for the reason that plaintiffs expressly stipulated in the pretrial order that "There is a balance due defendants by plaintiffs of $2,423.24 * * *." (Italics added) The reason for that stipulation emerges from the record. Windsor had taken over the control and management of the Shady Rest trucks, either by lease or under a partnership arrangement. Pecan had promised payment on a number of occasions  a promise *252 never kept  and had even gone further by asking Budny's to extend credit to the merged operation.
Accordingly, I would reverse and remand for entry of a judgment of no cause of action against plaintiffs and for $2,423.24, with interest from July 2, 1964 and costs, not only against Shady Rest but also against Windsor. In view of this conclusion, it is unnecessary to consider defendants' remaining contentions.